UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

JAMES LEGATE,                          §
                                       §
        Plaintiff,                     §
VS.                                    §          CIVIL ACTION NO. 2:13-CV-148
                                       §
WILLIAM STEPHENS, *et al*,             §
                                       §
        Defendants.                    §

### MEMORANDUM AND RECOMMENDATION
### ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In this prisoner civil rights action, Plaintiff James Legate challenges certain policies and practices of the Texas Department of Criminal Justice, Correctional Institutions Division ("TDCJ-CID") that he claims conflict with his right to practice his Native American faith, in violation of the Religious Land Use and Institutionalized Persons Act ("RLUPIA"), 42 U.S.C. § 2000cc, *et seq*., and the First Amendment. Plaintiff seeks injunctive and declaratory relief against the TDCJ-CID, by and through its Director, William Stephens, sued in his official capacity only, to: (1) allow Plaintiff to smoke a communal pipe and/or a personal pipe during Native American ceremonies; (2) provide a minimum of two pipe ceremonies per month and/or otherwise increase the number of Native American services at the McConnell Unit; (3) allow Plaintiff to grow his hair and/or grow a kouplock; and (4) allow Plaintiff to wear his medicine bag at all times. (D.E. 1, p. 5).

Pending is Defendant's motion for summary judgment to deny Plaintiff Legate's claims. (D.E. 23). Plaintiff has filed objections to the motion. (*See* D.E. 26, 40, 42).

For the reasons stated herein, it is respectfully recommended that the Court find that the TDCJ-CID's practices and policies at issue in this lawsuit do impose a substantial burden on Plaintiff's free exercise of his religious beliefs in violation of RLUIPA, but not the First Amendment.  It is respectfully recommended further that the Court find that the challenged TDCJ-CID policies and practices are the least restrictive means of providing religious freedom to Plaintiff, while simultaneously maintaining the TDCJ-CID's legitimate penological interests in security and safety within mandated budget constraints.  Thus, it is respectfully recommended that the Court grant Defendant's motion for summary judgment and dismiss Plaintiff's claims with prejudice.

## I.     Jurisdiction.

The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## I.     Procedural background and Plaintiff's claims.

Plaintiff is a prisoner in the TDCJ-CID, and is currently confined at the McConnell Unit in Beeville, Texas.  Plaintiff has been in TDCJ custody since 1999, serving a 99-year sentence for murder.  He is in general population and lives in a dorm-like setting, not a cell.  Plaintiff is Native American, and in 2002, he began studying and practicing the Native American religion.[1]  Tenets of his faith include: pipe ceremonies in

---

[1] It is acknowledged that neither the term "Native American faith" nor "Native American religion" adequately represents the defined belief system of Plaintiff Legate or any particular Native American practitioner because the faith itself encompass a wide range of beliefs from different tribes and regions.  (*See* Affidavit of Chari Bouse, Contract Native American Chaplain, D.E. 23-2, pp. 8-15, at pp. 9-10, noting "[c]urrently, there are 565 federally recognized tribes… Each tribe has its own specific customs and traditions.  However, there are several 'inter-tribal'

which prayers are offered to the Creator; the wearing of a medicine bag or pouch at all times to protect him from evil; not cuttings one's hair except in mourning upon the death of a relative or loved one; sweat lodges for purification; and the celebration of certain holy days to honor those Native American tribes that were massacred.  (D.E. 1, pp. 7-8).

On May 24, 2013, Plaintiff filed his original complaint alleging that certain TDCJ-CID policies violated his RLUIPA and First Amendment rights by prohibiting him from practicing his faith.  In particular, he complained that the McConnell Unit no longer allowed NA followers to smoke the ceremonial pipe in traditional or special pipe ceremonies; that NA studies and services had been reduced to less than once a month; that he could not wear his medicine bag at all times; and that he was forced to cut his hair.[2]  (D.E. 1).  He named as defendants: (1) Rick Thaler, the former TDCJ-CID Director who was subsequently replaced by the current Director, William Stephens; and (2) Native American Program Analyst, Clint Morris. *Id.* at 4-5.

On July 10, 2013, a *Spears*[3] hearing was conducted, following which it was recommended that Plaintiff's claims against Clint Morris be dismissed because his claims

---

customs, and even that varies in tribes from different states.  NAs are not religious by nature, but adhere to what we call a 'way of life.'  Our people are 'monotheistic,' meaning we recognize only one Creator God or deity…").  A running similarity in the Native American faith system is the central relationship of human beings, and their bodies, to the land, nature, reality, and spirituality.  *See Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 460-61 (1988) (J. Brennan, dissenting).

[2] Plaintiff originally complained also about the lack of sweat lodges, pointing out that certain federal facilities do offer sweat lodges for practitioners of the NA faith; however, Plaintiff abandoned that claim at the *Spears* hearing. *(See* D.E. 9, p. 3, n. 2).

[3] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

against that defendant arose when Plaintiff was confined at the Connally Unit and were not related to his claims against Director Stephens.  (D.E. 9, p.3 at n. 2).  Plaintiff did not file objections to the recommendation, and on August 19, 2013, the Court adopted the recommendation.  (D.E. 12).  Thus, the only claims remaining before the Court are Plaintiff's claims against Director Stephens in his official capacity for injunctive relief. *Id.*

On August 30, 2013, Director Stephens filed his Answer.  (D.E. 13).

On January 3, 2014, Defendant Stephens filed the instant motion for summary judgment.  (D.E. 23).

On January 15, 2014, Plaintiff filed his response in opposition to the summary judgment motion and requested additional time to conduct discovery.   (D.E. 26). Defendant objected to additional discovery time on the grounds that Plaintiff failed to establish good cause and that Plaintiff admitted to having been provided a copy of all documents via his discovery requests.  (D.E. 29).

On February 26, 2014, the Court granted Plaintiff additional time to file a summary judgment response.  (D.E. 31).  Thereafter, following a telephone conference, Plaintiff was given an additional thirty days to file his summary judgment response.  (*See* 03/12/2014 FTR Gold minute notes).

On April 21, 2014, Plaintiff filed his response in opposition to Defendant's summary judgment motion. (D.E. 40).  On May 5, 2014, Defendant filed a reply to Plaintiff's response.  (D.E. 41).  On May 22, 2014, Plaintiff filed a sur-reply.  (D.E. 42). There is no dispute that the issues have been fully researched and briefed.

III.    **Summary judgment evidence.**

    A.    **The *Davis* decision.**

On February 27, 2014, the undersigned United States magistrate judge entered summary judgment in favor of the TDCJ-CID and dismissed with prejudice the First Amendment and RLUIPA claims of two Native American prisoners also confined at the McConnell Unit, Teddy Norris Davis and Robbie Dow Goodman.   *See Davis & Goodman v. Pierce, et al.*, Case No. 2:12-cv-166 at D.E. 158, 159, (S.D. Tex, Feb. 27, 2014).   The Plaintiffs have appealed that decision.   *Id.,* D.E. 161. However, the undersigned notes that Plaintiff Legate's claims are very similar to those raised by Davis and Goodman, and indeed, identical pleadings have been filed in both cases by all parties. Accordingly, portions of this recommendation are repetitive of the February 27, 2014 Order entered in *Davis.*

    B.    **The *Yellowquill* case.**

On April 13, 1995, Jolene Yellowquill, a Native American of Ojibwe heritage who was confined at a TDCJ unit in Gatesville, Texas, filed suit for injunctive relief in the United States District Court for the Southern District of Texas, Houston Division, seeking, *inter alia,* that the TDCJ be required to provide sacred pipe ceremonies to Native American adherents confined within the TDCJ. (*See Yellowquill v. Scott,* Case No. 4:95-cv-1080, D.E. 1, 63).  On May 22, 1997, the Houston district court granted Yellowtail's motion for a temporary restraining order. (*Id.,* Case No. 4:95-cv-1080 at D.E. 71). Thereafter, the parties reached a settlement.   *Id.,* D.E. 119.   Although *Yellowquill*

involved only one inmate, the resulting settlement agreement served as the basis for the TDCJ implementing certain policies to address the practice of the NA faith.

### C. The TDCJ Offender Orientation Handbook, Policies after *Yellowquill,* and the *Chance* Litigation.

As previously noted, Plaintiff is challenging established TDCJ-CID practices and policies, many of which are found in the TDCJ Offender Orientation Handbook.[4]  In November 2004, the TDCJ Offender Orientation Handbook was revised.  The Handbook includes a grooming policy mandating that offenders maintain "good personal hygiene," brush their teeth daily, and be clean-shaven.  *(See* Handbook, p 10, Ch. III, "Standards of Behavior," § A at 1-3.).  As to hair length, the grooming policy states:

> Male offenders must keep their hair trimmed up the back of their neck and head.  Hair must be neatly cut.  Hair must be cut around the ears.  Sideburns will not extend below the middle of the ears.  No block style, afro, natural or shag haircuts will be permitted.  No fad or extreme hairstyles /haircuts are allowed.  No mohawks, tails, or designs cut into the hair are allowed.

*Id.,* p. 10 Ch. III, § A at 4.).

The November 2004 Offender Handbook also includes the TDCJ's Tobacco Policy, stating that "[a]ll facilities within the TDCJ are designated as tobacco free," and advising offenders found in possession of "tobacco products, paraphernalia or similar products may be charged with a disciplinary offense."[5]  (*Id*., p. 21, Ch. 3, § L "Tobacco Policy").

---

[4] A copy of the TDCJ Offender Orientation Handbook is available at http://www.tdcj.state.tx.us/documents/Offender_Orientation_Handbook_English.pdf.
[5] Effective March 1, 1995, the TDCJ banned the use of all tobacco products within its institutions, for both offenders and employees.  (*See Davis,* D.E. 121, Appx 127-129).

In November 2008, the TDCJ Chaplaincy Department revised Policy 09.03 (rev. 4) to create an exception to the TDCJ tobacco ban for NA believers at pipe ceremonies. (*See Davis,* Case No, 2:12-cv-166 at D.E.122, Appx 367-369).[6] The policy provided:

> (3)  TDCJ policy forbids the use or possession of tobacco in prison by offenders.  However, an exception to policy is in effect for Native American religious practitioners participating in the circle group prayer pipe ceremony of Native American-designated units/facilities.
>
> . . .
>
> (5)  The pipe ceremony will be <u>conducted at a rate of no</u> <u>more than</u> <u>twice each month on Native American-designated units/facilities.</u> This is contingent upon availability of a qualified Native American chaplain, or a TDCJ approved volunteer, the pipe ceremony will be supervised and/or facilitated by one of these.
>
> (6)  The pipe ceremony will include tobacco or sage, sweet grass, kinnikkinnick, or cedar.   These may be used in combination as prescribed by Native American tradition.

(*Id.*, Appx 367-369) (emphasis in original).

On June 16, 2011, William Chance, a Native American prisoner confined at the Michael Unit in Tennessee Colony, Texas, sued the TDCJ and certain officials in the United States District Court for the Eastern District of Texas, Tyler Division, alleging that he had been denied, *inter alia,* the right to participate in pipe ceremonies and smudging rituals in violation of RLUIPA and his First Amendment rights.  (*See Chance v. TDCJ,* Case No. 6:11-cv-435, D.E. 1).  Plaintiff Chance related that he suffers from

---

[6] In *Davis,* Defendants offered a copy of the TDCJ's former tobacco exception policy for NA faith adherents, but declined to do so in this case.  The policy is relevant, however, in demonstrating that the TDCJ previously allowed NA practitioners to smoke from a communal or personal pipe and is therefore referenced herein, as are other documents filed in the *Davis* litigation that help develop the facts of this case.

two serious infectious diseases, Hepatitis C and Tuberculosis, and because of his communicable diseases, he could not smoke from the communal pipe used during pipe ceremonies, and he sought permission to possess a personal pipe.  *Id.*

In response to the *Chance* litigation, on September 8, 2011, a meeting was held with former TDCJ-CID Director Rick Thaler, Chaplaincy Director Bill Pierce, Program Analyst Clint Morris, and other officials to discuss the status of NA contract chaplains, the possibility of hiring full-time chaplains, and NA communal pipe services, including medical and sanitation issues, liability releases, protective covers for pipes, frequency of pipe services, costs of pipes, and the increase in NA adherents over time.  (*See* D.E. 23-3, pp. 73-76).  At the meeting, it was decided that only the Native American Chaplain could smoke the ceremonial pipe at a pipe ceremony.  *Id.*  Thereafter, on or before October 12, 2012, it was communicated to all NA Chaplains that no offender was allowed to personally smoke the pipe in a pipe ceremony. *See*  D.E. 23-2, pp.2-3, October 12, 2012 Inter-Office Memorandum from Marvin Dunbar, Manager III Services, to all NA Chaplains).  The Memorandum states:

> To ensure consistency among the Native American Pipe service, the following information is being provided to clarify the handling of the pipe.  Effective immediately, offenders participating in the Native American Pipe service will be allowed only to handle the pipe prior to its lighting.   This was the practice on the majority of units and will be the standard from this point forward.   The pipe can be the contract Native American chaplain's pipe or one donated to the unit.
>
> The contract Native American chaplain or authorized Native American volunteer will be the only individual allowed to smoke the pipe.

> Please note upon the notification that a unit has been
> quarantined for any reason, the handling of the communal
> pipe will cease until the quarantine has been lifted.

(D.E. 23-2, p. 2).  *See also* D.E. 23-2, Affidavit of Edward Hernandez, former contract chaplain who provided services at Connally, Daniel, McConnell and Terrell Units from November 8, 2011 to March 2012, who testified that, in September 2011, he was advised that the TDCJ-CID had changed its NA policy to prohibit anyone except the contract chaplain to smoke the pipe due to the communicable disease issue.  *And see* D.E. 23-3, pp. 33-35, Amended Report of Robert J. Eason, TDCJ-CID Deputy Director of Prison and Jail Operations, reporting on medical barriers to communal pipe use and communicable illnesses in a prison setting.  *And see* D.E. 23-3, pp. 22-26, Report of Dr. Robert Williams whose opinion is that the communal pipe presents a "poor health practice" and an unnecessary risk of the spread "of all communicable diseases including influenza, norovirus, viral hepatitis, (HAV, HBV, HCV) HIV, and herpes, among the prison population."  *Id.* at 24.

In July 2012, the TDCJ Chaplaincy Department revised Policy 05.01 regarding Religious Devotional Items and Observed Holy Days."  (D.E. 23-2, pp. 19-66).  Policy 05.01 Section D provides specific information about "Medicine Bags or Pouches" and specifically states that "[w]earing the bag or pouch is limited to the offender's cell or immediate bunk area in a dorm setting, and at religious services."  (D.E. 23-2, p. 21).

### E.   Plaintiff Legate.

Plaintiff entered the TDCJ on February 5, 1996, and at that time, he self-identified his religious preference as Roman Catholic.  (*See* D.E. 23-1, p. 3).  On September 20, 2002, Plaintiff changed his religious faith preference to Native American.  *Id.*  Plaintiff arrived at the McConnell Unit, which is designated as a Native American Unit, in July 2012.

By letter dated December 20, 2012, Plaintiff complained to Bill Pierce, the TDCJ Chaplaincy Director, about the quality and quantity of Native American services at the McConnell Unit. (D.E. 23-1, pp. 5-6).  He complained that the volunteer chaplain, Shawna Mitchell, conducted the services inside rather than outside; he could not grow his hair; he could not wear his medicine bag at all times; certain holy days were not acknowledged; there was no sweat lodge; and most troubling of all, he could not personally smoke a pipe to offer his prayers.[7]  *Id.* at 6.   On May 13, 2013, Sam Longoria with the Office of Offender Communications, Chaplaincy Department, addressed Plaintiff's complaints.  (DE. 23-1, pp. 7-10).  He related that the Chaplaincy Department could not grant any exceptions to the grooming policy regarding hair length, that he was working with Chaplain Packard to "clear up" some issues, and that some issues might need to be resolved through the grievance process.   *Id.* at 7.

---

[7] Plaintiff related that, at his prior unit, Chaplain Burke had allowed him to purchase his own pipe, but it was confiscated, forcing him to file a lawsuit in state court, L*egate v. Lee & Pierce,* Cause No. 09-01-00005-CVK, which concluded with Plaintiff's personal pipe being sent to his home.

**IV.  Summary judgment standard.**

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  *Id.*  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).   Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## V.  Discussion and Analysis.

### A.  Threshold determinations.

### (1)  The *Chance* case and summary judgment.

As a threshold matter, the Court notes that a common thread throughout Plaintiff's RLUIPA claims is premised on the fact the TDCJ previously allowed practices that it now seeks to prohibit. Plaintiff argues that, because the TDCJ followed more liberal

policies in the past, and also because the TDCJ allows women prisoners to grow their hair and other prisons allow certain practices that the TDCJ does not, there necessarily exists a genuine issue of material fact on the issue of least restrictive means such that summary is inappropriate as a matter of law.

The Fifth Circuit has squarely rejected the idea that a fact issue is created as to the issue of least restrictive means simply because the TDCJ had a past policy allowing a now-prohibited activity or that other correctional systems allow an activity that the TDCJ prohibits. *See United States v. Chance,* 730 F.3d 404 (5th Cir. 2013).  In *Chance,* the Native American plaintiff was seeking *inter alia*, access to a sweat lodge, and he offered evidence that a federal correctional facility nearby provided such access.  *Id.* at 411.  The Fifth Circuit found irrelevant the practices of other prison systems, noting that a comparison of policies ignores "the differences between institutions and all the other factors that might be more relevant in a given case."   *Id. (*citing *Fowler v. Crawford,* 534 F.3d 931, 934 (8th Cir. 2008)).  The Fifth Circuit concluded that the mere existence of a prison policy that differs from a past policy or another institution's policy does not necessarily entitle a plaintiff to survive summary judgment on his RLUIPA claim.  *Id.* Indeed, as the *Chance* Court aptly noted: "That TDCJ or other prisons have tolerated unsafe practices in that past is not a reason to permanently bind it to a dangerous policy."[8]  *Id.* at 412. Rather, as will be discussed in more detail below, the RLUIPA

---

[8] Other circuit courts have rejected the adoption of a per se rule or bright-line test in evaluating RLUIPA's least restrictive means issue.  *See, e.g., Mays v. Springborn,* 575 F.3d 643, 647 (7th Cir. 2009) (affirming summary judgment dismissing prisoner's free exercise claim where "the only evidence he produced was that the [forbidden items] were allowed at other prisons"); *Spratt*

analysis mandates a case-specific approach when analyzing the issue of least restrictive means on summary judgment, and accordingly, it is respectfully recommended that the Court overrules Plaintiff Legate's argument that a fact issue exists simply because the TDCJ previously had more liberal policies or that other penal institutions provide more services and accommodations to offenders practicing the NA faith.

### (2)   Substantial burden and sincerity of Plaintiff Legate's beliefs.

A second issue properly addressed at the onset of this case is the sincerity of Plaintiff's Native American beliefs. *See Moussazadeh v. TDCJ,* 703 F.3d 781, 790-92 (5th Cir. 2012). Briefly, each case turns on its particular facts. *Id.* at 791. The specific religious practice must be examined rather than the general scope of applicable religious tenets, and the plaintiff's "sincerity in espousing that practice is largely a matter of individual credibility. *Id.* at 792. In fact, the sincerity of a plaintiff's engagement in a particular religious practice is rarely challenged. *Id.* at 791. As *Moussazadeh* explains, "[t]hough the sincerity inquiry is important, it must be handled with a light touch, or 'judicial shyness.'" *Id.* at 792 (quoting *A.A. ex rel Betenbaugh v. Needville ISD,* 611 F.3d 248, 262 (5th Cir. 2010).

In this case, Defendant Stephens does not challenge the sincerity of Plaintiff's beliefs, but argues that the policies at issue do not impose "substantial" burdens on the exercise of his faith. Whether or not the challenged policies create substantial burdens does not cast any doubt as to the sincerity of Plaintiff's held beliefs, and indeed, his

---

*v. R.I. Dep't of Corr.,* 482 F.3d 33, 42 (1st Cir. 2007) ("[E]vidence of policies at one prison is not conclusive proof that the same policies would work at another institution." ).

previous lawsuit, his transfer to a NA designated unit, and his participation in this lawsuit are all evidence that Plaintiff Legate is sincere in the practice of his NA faith.

### B.     The RLUIPA Standard.

Congress enacted the RLUIPA as a response to the Supreme Court's decisions in *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872 (1990) and *City of Boerne v. Flores,* 521 U.S. 507 (1997).  In *Smith,* the Supreme Court held that the Free Exercise Clause typically does not shield religiously motivated conduct from the burdens of generally applicable laws.  494  U.S. at 878-79.  Congress responded three years later by enacting the Religious Freedom Restoration Act ("RFRA").  In an effort to restore the level of protection that religious observations enjoyed before *Smith,* the RFRA mandated that "government"—including state and local governments—"shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless such a burden met a "compelling governmental interest" and "least restrictive means" test.  42 U.S.C. § 2000bb-1.  In *Flores,* the Court declared the RFRA's application to the states unconstitutional because it exceeded Congress's Fourteenth Amendment enforcement power.  521 U.S. at 532-36.

In response to the *Flores* decision, Congress enacted RLUIPA, predicating its enactment not only on its power to enforce the Fourteenth Amendment, but also on its Spending and Commerce powers.   RLUIPA targets two areas: land-use regulation and institutions that receive federal funds.  With respect to its protection of institutionalized persons, the RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution … even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> > (A) is in furtherance of a compelling governmental interest; and
> >
> > (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The Act broadly defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A). Under the RLUIPA, the plaintiff bears the burden to prove that the challenged law, regulation or practice substantially burdens his exercise of religion. Once a plaintiff has made this *prima facie* showing, the defendant bears the burden to prove that the challenged regulation is the least restrictive means of furthering a compelling governmental interest. *Id.,* § 2000cc-2(b). *And see Sossamon v. Texas,* 131 S. Ct. 1651 (2011).

Despite RLUIPA's express purpose to protect the religious observances of individualized persons, the statute does not give courts carte blanche to second-guess the reasoned judgments of prison officials. Indeed, while Congress enacted the RLUIPA to address the many "frivolous or arbitrary" barriers impeding institutionalized persons' religious exercise, it nevertheless anticipated that courts entertaining RLUIPA challenges "would accord 'due deference to the experience and expertise of prison and jail administrators.'" *Cutter v. Wilkinson,* 544 U.S.709, 716-17 (2005) (*quoting* 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sens. Hatch and Kennedy on the

RLUIPA)).  The Supreme Court has cautioned that "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety," and "an accommodation must be measured so that it does not override other significant interests."  *Id.* at 722.  The Court further instructed:

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns.  While the Act adopts a "compelling governmental interest" standard, context matters in the application of that standard. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions.  They anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

*Id.* at 722-23 (internal quotation marks and citations omitted).  This deference is not, however, unlimited, and "policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the Act's requirements." *Rich v. Secretary, Florida Dep't of Corrections,* 716 F.3d 525, 533 (11th Cir. 2013) (internal quotation marks omitted).

### C.    Application of RLUIPA Standard to this Case.

#### (1)    The policies complained of present a substantial burden on Plaintiff's ability to practice his faith.

Under RLUIPA**,** Plaintiff Legate must initially demonstrate that a government practice imposes a "substantial burden" on his religious exercise, which requires the Court to determine: (1) whether the burdened activity is "religious exercise," and if so, (2) is the burden "substantial"?  *Adkins v. Kaspar,* 393 F.3d 559, 567 (5th Cir. 2004).

RLUIPA defines "religious exercise" to include "any exercise of religion," whether or not compelled by, or central to, a system of religious beliefs." *Id.* A government action or regulation creates a substantial burden on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs. *Id.* at 570.

Plaintiff Legate maintains that certain TDCJ policies impose a substantial burden on his ability to practice his NA faith. In particular, Plaintiff complains about the TDCJ's: (1) ban on communal and individual pipes; (2) lack of twice-monthly NA services; (3) the TDCJ grooming policy that prohibits long hair and/or a kouplock; and (4) the TDCJ's ban on medicine bags being worn outside of an offender's cell or living area. Plaintiff contends that the purpose of the ceremonial Pipe is to establish a personal relationship with the Creator through a direct dialogue which can only be accomplished by personally inhaling and exhaling the smoke from the ceremonial Pipe. (D.E. 42 at 2). For the Spirits to answer a NA participant's prayers, he must make a personal offering to them by personally smoking the pipe. *Id.* He argues further that his faith is practiced and reinforced in ceremonies and gatherings with other NA believers, but contends that the TDCJ has failed to provide even the minimal amount of services described in its policies because it has failed to employ contract chaplains or locate volunteer chaplains to conduct and/or oversee ceremonies. Another tenet of Plaintiff's NA faith is to grow his hair and to cut it only in times of mourning. However, the TDCJ grooming policy requires that male offenders must keep their hair trimmed up the back of their neck and head, and also trimmed around the ears. If an offender refuses to comply with the

grooming standards, he is subject to disciplinary charges that can result in the loss of privileges, and possibly, adversely affect time-earning classification and good time credits.  Plaintiffs suggest that, as a proposed compromise to long hair, that he be permitted to wear a kouplock, that is, a 2" x 2" square patch of hair at the base of the skull which may grow continuously.  (D.E. 1, p 5). Finally, Plaintiff claims that the challenged TDCJ-CID policies substantially burden his religious exercise by not allowing him to wear his medicine bags at all times, including when he is walking to chow or to work, or socializing in common areas.  Plaintiff believes that the medicine bag and its contents help protect him from evil spirits and is thus necessary to be worn at all times, not just to and from services.

In *Atkins v. Kaspar,* the Fifth Circuit noted that it held under RFRA that circumscribing the use of a medicine bag did not rise to the level of a substantial burden on a prisoner's NA practice, but grooming regulations did.[9]  *Atkins,* 393 F.3d at 568, n. 35 (citing *Diaz v. Collins,* 114 F.3d 69 (5th Cir. 1997)).  However, given the Supreme Court's mandate to examine RLUIPA claims on a fact-specific case-by-case basis, it is respectfully recommended that the Court find that Plaintiff Legate has met his summary

---

[9] In *Odneal v. Pierce*, 324 Fed. Appx. 297, *2-3 (5th Cir. Apr. 3, 2009), the Fifth Circuit reversed this Court's § 1915A dismissal of the plaintiff's RLUIPA claims concerning his medicine bag and kouplock because this Court mistakenly applied the "legitimate penological interests" test of *Turner v. Safley*, 482 U.S. 78 (1987) and not the RLUIPA's heightened standard of review.  The fact that the *Odneal* decision was reversed and remanded on the kouplock and medicine bag claims, however, does not mean the Fifth Circuit found TDCJ's policies regarding the kouplock or medicine bags to be a substantial burden on Odneal's religious exercise.  To the contrary, because it was a § 1915A dismissal, there was no factual record created.  Thus the *Odneal* case has little or no bearing on the case *sub judice*.

judgment burden to establish that the complained-of TDCJ policies and practices place a substantial burden on Plaintiff's religious exercise of his NA faith.

**(2)    Least restrictive means.**

Having established substantial burden under RLUIPA, the burden now shifts to Defendant Stephens to demonstrate that the challenged policies are the least restrictive means of furthering a compelling governmental interest.   42 U.S.C. § 2000cc-1(a); *Chance v. TDCJ*, 730 F.3d 404, 410 (5th Cir. 2013).

**(a)    *Smoking and/or possessing a Pipe.***

Under current TDCJ policy, the contract NA chaplain or authorized NA volunteer is the only individual permitted to smoke the Pipe.  (*See* D.E. 23-2, p. 2, October 12, 2012 Inter-Office Memorandum Re: "Policy regarding Native American pipe service"). Offenders are permitted to handle the pipe prior to its lighting.  *Id.* Prior to this change in policy, Plaintiffs and other NA offenders were allowed to smoke a communal sacred pipe.  However, several NA offenders filed administrative grievances with the TDCJ complaining about the risk of communicable disease transmission from a communal pipe, prompting TDCJ officials to seek a medical opinion from Dr. Robert Williams, Deputy Director of TDCJ's Health Service Division.  (*See Chance,* 730 F.3d at 413 (noting that, prior to Chance filing his lawsuit, other NA inmates had raised health concerns about the communal pipe)).  In his opinion, Dr. Williams concludes:

> There is no way to share an object designed to be placed in one's mouth outside of a clinical setting with enough certainty that diseases cannot be transmitted for Health Services to advocate instituting this practice.  If it is determined that [TDCJ's] obligation to allow observance of this practice outweighs [TDCJ's] obligation to prevent

> spread of infection in our institutionalized setting, [TDCJ] will have to take as effective measures as are feasible, but it should be understood that the repercussions of this practice may extend beyond the participants since they would subsequently expose others with whom they have close contact to any disease they contracted from participating in the practice.

(*See* D.E. 23-3, pp. 22-24, Report of Dr. Robert Lewis Williams, dated November 6, 2013, citing to his previous opinion that is also cited in *Chance*).  Based on Dr. Williams' recommendation, the TDCJ determined that it would no longer permit a communal pipe ceremony.  Although a form of the sacred pipe ceremony would still be held, only the chaplain conducting the service would be allowed to smoke the pipe and pray on behalf of those present.  (*See* D.E. 23-2, p. 2, October 12, 2012 Inter-Office Memorandum Re: "Policy Regarding Native American pipe service").   The uncontested evidence establishes that the change in the communal pipe policy was based on the TDCJ's compelling interest in preventing the spread of diseases.

Plaintiff Legate argues that the TDCJ's new pipe ceremony is an insufficient accommodation of his religious exercise under RLUIPA because personal participation in the pipe ceremony is essential.  Conceding the medical concerns, Plaintiff argues that, with respect to the least restrictive means, NA adherents should be allowed to possess their own personal pipe, and that the pipes could be stored in-between ceremonies by the prison chaplain in his or her office.

The TDCJ previously considered the proposal of NA practitioners possessing personal pipes, but concluded that the security risks and associated costs were too great, and that a pipe smoked only by the ceremony leader is indeed the least restrictive means.

For example, on September 8, 2011, Defendant Morris, Director Pierce, and numerous TDCJ officials met to discuss various issues concerning Native American ceremonies. (*See* D.E. 23-3, pp. 73-76).  It was noted that pipe ceremonies were conducted at the Daniel Unit with a shared pipe, and a discussion followed regarding medical and sanitation issues, and liability releases.  *Id.* at 73-75.  Security issues were discussed, and it was noted that tobacco distributed for the pipe ceremony at the Daniels Unit "kept disappearing."  *Id.* at 74.  The group discussed personal pipes for Native American offenders, but concluded personal pipes would create a security concern and burden, and the cost was too great.  *Id.* at 75.  It was noted that the Cherokee Nation of Texas, the Lakota Nation and the Apache Nation were not interested in assisting with the cost or donation of personal pipes as they believed the offenders had "lost the right to take of the pipe."  *Id.* at 76.  The group reached a consensus that there be: (1) no communal offender pipes; (2) no offender-owned or possessed pipes allowed; (3) no storage of offender-possessed pipes or pipe herbs by the TDCJ; and (4) Native Americans be provided with one pipe ceremony per month, with smoking to be done only by the volunteer/chaplain. *Id.* at 76.

Robert Eason is the TDCJ-CID Deputy Director of Prison and Jail Operations. (D.E. 23-3, pp. 27-72).  Mr. Eason has been a TDCJ employee for over twenty years and has personal experience in the areas of prison staffing, budgets, and security review.  *Id.* at 30-31.  Mr. Eason related that, as part of the September 8, 2011 meeting, TDCJ officials examined whether individual pipes would be feasible as the least restrictive means, and it was noted at the onset that: "Pipe ceremonies in which offenders are

allowed to smoke and handle contraband, such as pipes, tobacco and fire starting materials present serious challenges to the safety, security, and operation of a unit." *Id.* at 32-43.  In addition, it would take considerable time to distribute, inventory, and track every Native American believer's pipe for every pipe ceremony.  *Id.* at 36.  Additional logistical problems are created by the necessity of cataloguing and storing several hundred pipes.  *Id.* Mr. Eason explained that disposable pipes, assuming availability, would not be a feasible alternative.  *Id.* This is because tobacco is banned in Texas prisons, and is considered valuable contraband.  *Id.* The TDCJ would have to devote extensive manpower to ensure that none of the pipe ceremony participants stole or hid a pipe. *Id.*

As to the McConnell Unit in particular, Mr. Eason pointed out that, due to the boom in the hydraulic fracturing industry on the Eagle Ford Shale, wages and the cost of living have increased in the area, and the TDCJ is not able to compete with the oil and gas salaries available, resulting in severe staff shortages.  (D.E. 23-3, pp. 47-48).  Indeed, on Mr. Eason's last visit to the McConnell Unit on June 27, 2013, only 37 of the 99 correctional officers working there were assigned to that unit; the other 62 are assigned to other units and were working overtime.  *Id.* at 48.

In *Chance v. TDCJ,* the Fifth Circuit considered essentially the same evidence as is now before this Court in regards to pipe ceremonies, including Dr. Williams' medical opinion and Mr. Eason's costs and security analysis.  *Id.* 730 F.3d at 412-414.  The Fifth Circuit concluded that the TDCJ had met its burden of establishing that the ban on communal and individual pipes, and allowing only the ceremony leader to smoke the pipe

at ceremonies, was the least restrictive means to conduct pipe ceremonies, and accordingly, not in violation of RLUIPA.  In this case, the TDCJ has presented additional and more compelling evidence to support this same conclusion given the documented staff shortages at the McConnell Unit.  In addition, Defendant has offered additional evidence suggesting that, under the NA faith system itself, the fact that an NA believer is incarcerated may prohibit him from partaking in the sacred pipe while in prison.  (*See* D.E. 23-2, pp. 7-15, Affidavit of Chief Chari Bouse, in which Chief Bouse reports that, after researching the issue, he found no tribes that would allow an offender inside the "Iron House" to smoke the sacred ceremonial pipe due to the negative or "dark winds" that preside there.  *Id.* at p. 11.  In addition, Chief Bouse had personally attended a ceremony where the Elders of the tribe smoked the pipe on behalf of the 3000 attendees, refuting Plaintiff's allegation that he must personally partake in the pipe.  *Id.*  Edward Hernandez, the Chaplain for the Marlin Unit, testified that he did not know of any tribe "…that believes that prayers to the Creator can only be conducted by personally smoking the Pipe."  (D.E. 23-2, p. 17).

Defendant Stephens has offered unrefuted summary judgment evidence that the TDCJ's policy banning personal and communal pipes while allowing a contract chaplain to smoke the ceremonial pipe and to offer the prayers on behalf of the NA offenders in attendance is the least restrictive means of conducting the sacred pipe ceremonies and does not violate RLUIPA or the First Amendment.  Accordingly, it is respectfully recommended that the Court grant summary judgment in Defendant Stephens' favor on the pipe claim.

(b)    *Number of services.*

In his original complaint, Plaintiff Legate alleged that his RLUIPA rights were violated because he is deprived of an annual ceremony dedicated to all Native Americans who were massacred during the settling of the country.   The *Yellowtail* decision mandated pipe ceremonies twice a month, with additional ceremonies for holy days. Defendant Stephens does not object to the idea of bi-monthly services as well as holy days, and in July 2012, Policy 5.01 was amended as to the Native American and Native American Shamanism faiths.  (*See* D.E. 23-2, pp. 45-48).   Concerning "Holy Days" in particular, Policy 5:01 provides:

> For Native Americans, every day is a "Holy Day."  There are no fixed designated "Holy Days" or a standard calendar within this faith community.   Native Americans celebrate certain occasions with prayers, dances, songs, and other means of spirituality which differ from tribe to tribe and season to season.   Each and every day is an individual's opportunity and responsibility to seek the divine (Creator, Great Spirit, or Mystery).[10]

(D.E. 23-2, p. 45).

In addition, Defendant offers the affidavit of TDCJ Director of Chaplaincy Operations Billy Pierce detailing the TDCJ's revised Administrative Directive regarding religious policy, A.D. 07.30 (rev. 6).[11]   Director Pierce relates:

---

[10] For the Native American Shamanism, there are four Holy Days: Spring Equinox; Summer Solstice; Fall Equinox; and Winter Soltice.  (D.E. 23-2, p. 47).

[11] In the *Davis* case, Director Pierce detailed the efforts he and the Chaplaincy Department undertook in an attempt to find and secure NA contact chaplains and volunteers. (*See Davis,* Case No. 2:12-cv-166, D.E. 122, Appx 402-409).   The revised A.D. 07.30 suggests that the Chaplaincy Department has successfully recruited additional chaplains and volunteers.

The TDCJ currently offers Native Americans offenders weekly services. Once monthly, one of these services is a pipe ceremony conducted by the contract Native American chaplain on designated units. Offenders can also check out Native American books from the Chaplaincy library weekly. On non-designated units, services are facilitated weekly when there are a sufficient number of Native American offender participants. Offender Legate is assigned to the McConnell unit which is a designated Native American unit.

(D.E. 23-3, p. 20).

The Fifth Circuit has considered challenges by inmates of other faiths regarding the frequency of services. The volunteer policy has been reviewed and upheld on numerous occasions. *See Mayfield v. TDCJ*, 529 F.3d 599, 613-14 (5th Cir. 2008); *McAlister v. Livingston*, 348 Fed. Appx. 923, 936-37 (5th Cir. 2009); *Newby v. Quarterman*, 325 Fed. Appx. 345, 350-52 (5th Cir. 2009). Moreover, in *Chance v. TDCJ,* the Fifth Circuit expressly rejected the plaintiff's RLUIPA complaint about the frequency of services due to the limited number of outside volunteers, finding that the volunteer policy itself is reasonable and necessary, and "that it is the least restrictive means of furthering TDCJ's compelling interest in prison administration." *Chance,* 730 F.3d at 414-15. Although *Chance* involved an inmate at the Michael Unit, the summary judgment evidence establishes that the difficulties in finding qualified chaplains and volunteers is prevalent across Texas, adversely affecting all TDCJ prison units. Much of the evidence in this case is the same or updated versions of the evidence presented in *Chance,* and accordingly, Plaintiffs' RLUIPA claim based on the frequency of NA services is foreclosed.

(c)     *Wearing long hair or a kouplock.*

Plaintiff objects to the TDCJ's grooming policy that requires him to cut his hair on a regular basis, a practice that is in direct contradiction to his beliefs and imposes a substantial burden on the exercise of his faith.   The burden is on Defendant to demonstrate that the challenged grooming policy is the least restrictive means of achieving the compelling government interest behind the policy.  *See Garner v. Kennedy,* 713 F.3d 237, 241-42 (5th Cir. 2013).

TDCJ Regional Director Robert Eason testified that the grooming policy impacts the TDCJ's compelling interests in both security and costs.  (D.E. 23-3, pp. 27-71).  Mr. Eason first observes that longer hair would necessarily result in increased searches and increased physical contact between officers and offenders in the "strike zone."  *Id.* at 50. Currently, correctional officers are trained to keep an arms-length distance between themselves and offenders, and with an inmate's hair no longer than the collar, visible inspections are effective and the officer need not touch the inmate.  *Id.*  If an inmate is allowed to wear long hair or even a braid, the hair must be searched, thus diverting the attention of the officer from supervising the larger population to focus on a single prisoner.  *Id.*  In addition, searching an offender's hair takes time, and time pressures impact the entire unit schedule and the ability to move offenders.  *Id.*

In addition to exposing officers to more risk and negatively impacting time and schedules, Mr. Eason notes that long hair can be used against the offender himself if assaulted or otherwise engaged in a physical confrontation.  (Eason Aff't, D.E. 23-3, p. 56).  Long hair or a braid allows another inmate to grab the hair and control the victim.

*Id.* Mr. Eason points out that the TDCJ is regularly sued by prisoners for allegations of failure to protect, and he states that the risk of long hair unnecessarily exposes the TDCJ to increased liability.   *Id.* Finally, Mr. Eason points out that long hair would make identification of prisoners both in and outside of prison (in the event of an escape), more difficult.  *Id.*

Defendants also offer the testimony of Jennifer Gonzalez, Assistant Budget Director of the TDCJ Business and Finance Division.  (D.E. 23-3, pp. 87).  Based on time estimations provided by Mr. Eason, Ms. Gonzales calculated that the annual cost to search offenders hair if all prisoners were permitted to grow their hair past collar length would be approximately $151,412.95.  *Id.* at 450.

Although RLUIPA claims must be evaluated on a case-by-case basis, the Fifth Circuit has effectively foreclosed Plaintiff's RLUIPA claim regarding the grooming policy and his desire to wear long hair.  In *Longoria v. Dretke,* 507 F.3d 898 (5th Cir. 2007), the plaintiff, an inmate of Mexican and Native American descent, requested permission to grow his hair because the Great Spirit instructed him to do so. *Id.*  He advised prison officials that he would not cut his hair due to his religious beliefs, but officials told him he would not be exempt from the grooming policy.  He sued under RLUIPA and the district court dismissed the lawsuit as frivolous.  On appeal, the Fifth Circuit referenced its decision in *Diaz v. Collins,* 114 F.3d 69 (1997), that was decided under RFRA, and held: "Because the test under RLUIPA is sufficiently the same as that previously imposed under RFRA, we hold TDCJ-ID did not violate Longoria's rights by,

pursuant to the grooming policy, denying him permission to grow his hair." *Longoria,*

507 F.3d at 901.

In *Thunderhorse v. Pierce,* 364 Fed. Appx. 141 (5th Cir. 2010) (unpublished), the

Fifth Circuit again relied on *Diaz and* noted:

> … that prisoners may hide weapons and other contraband in their hair.
> 114 F.3d at 73.  In addition, requiring short hair makes it more
> difficult for an escaped prisoner to alter his appearance from
> photographs that the TDCJ periodically takes of each inmate.  *Id.*  In
> light of these concerns, we held that "the security interest at stake
> cannot meaningfully be achieved appropriately by any different or
> lesser means than hair length standards.  *Id.*

*Thunderhorse,* 364 Fed. Appx. at *4.  Thus, the Fifth Circuit has determined that, even if

the grooming policy interferes with a prisoner's right to practice his religion, the policy is

the least restrictive means of furthering the TDCJ's compelling interest in security and

managing costs.  The evidence presented in this case falls squarely within that reasoning,

and Plaintiff Legate fails to establish that a genuine issue of a material fact exists.

Similarly, Plaintiff's concession to wear a kouplock raises the same security

concerns and costs as does his request to grow long hair.  The Fifth Circuit has held that

RLUIPA "is not meant to elevate accommodation of religious observances over the

institutional need … to control costs," and "controlling costs … involves compelling

governmental interests."  *DeMoss v. Crain,* 636 F.3d 145, 154 (5th Cir. 2011) (quoting

*Baranowski v. Hart,* 486 F.3d 112, 125 (5th Cir. 2007).  The TDCJ is not obligated to

spend large amounts of money in order for Plaintiff to wear long hair or a kouplock.  The

uncontroverted summary judgment evidence establishes that allowing long hair or a

kouplock could increase the danger to correctional officers during a search as they must

enter the "strike zone," increase the risk of serious injury to NA offenders if attacked by another inmate, and lead to increased liability exposure to the TDCJ.  The grooming policy is the least restrictive means of promoting the TDCJ's compelling interests in security and costs.

>    *(d)*    ***Medicine bags.***

For the same reasons Plaintiff Legate's RLUIPA and First Amendment claims must fail in regards to hair length and kouplocks, so must his challenge to the TDCJ policy that limits the wearing of his medicine bag at all times: the potential security risks and costs are too great.

Since 2009, the TDCJ Chaplaincy Department has included medicine bags and pouches as approved devotional items for offender possession.  (*See* D.E. 23-2, pp. 19-24).  The religious devotional items policy also provides that "[f]or religious reasons, any inspecting officer shall exercise case while performing a visual examination of authorized content and shall not touch the bag or its contents or ask what the items represent, provided contraband is not detected." *Id.* However, despite the TDCJ's approval of the medicine bags, "[w]earing the bag or pouch is limited to the offender's cell or immediate bunk area in a dorm setting, and at religious services."  (*See* D.E. 23-2, p. 21). Plaintiff testified that he can also wear his medicine bag on his way to and from services.

Mr. Eason testified that, were an offender allowed to wear or move about the prison with his medicine pouch at all times, he would be at a greater risk of harm from other offenders, and would also present additional work for security officials:

> The ability to quickly and effectively search medicine bags is a basic correctional security need.  A bag or pouch which is not transparent and cannot be touched by a correctional officer becomes an ideal place to store contraband, particularly drugs or weapons.  A cell phone, or at the very least a SIM card could easily be stored within a medicine bag.  Accordingly, TDCJ correctional officers regularly request offenders open and display the contents of the medicine bag during cell searches or when offenders are on their way to religious services.  These searches occur most commonly while offenders are en route to and from the weekly religious service.  The offender must place the bag in the view of the officer and remove the contents for examination.  The time an offender takes to perform this activity is generally longer than it would take an officer to perform the same process.  The offender must then replace the contents of the bag.

(D.E. 23-3, pp. 44-45, Eason report).  Director Eason points out further that Plaintiff Legate, who has a job on the unit, would be subjected to this additional search daily.  *Id.* Jennifer Gonzales calculated the costs to search the medicine bags of 84 offenders every day would be approximately $31.15  a day or $11,369.75 annually. (D.E. 23-3, p. 85). Defendant has successfully established that its policy limiting NA offenders' wearing their medicine bags to their cell areas and NA services is the least restrictive means in the context of valid security and cost concerns.

     *(e)*    **First Amendment.**

Plaintiff Legate's allegations do not establish constitutional violations under the Free Exercise Clause. The Supreme Court has made it clear that prisoners must be provided "reasonable opportunities" to exercise their religious beliefs. *Cruz v. Beto*, 405 U.S. 319 (1972) (*per curiam*). The Court has recognized, however, that limits may be placed on the religious rights that must be afforded to inmates. In *Turner v. Safley*, 482

U.S. 78 (1987), the Supreme Court held "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," and "[w]hen a prison regulation impinges upon the inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. Four factors that should be considered in determining the reasonableness of a regulation: (1) there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) are there alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation will have on guards and other inmates, and on the allocation of prison resources generally; and (4) the absence of alternatives is evidence of the reasonableness of a prison regulation. *Id.* 89-91. Shortly after the *Turner* decision, the Supreme Court applied the test to uphold a prison policy that prevented inmates from attending Islamic prayer services. *O'Lone v. Estate of Shabazz*, 482 U.S. 382 (1987). The Fifth Circuit subsequently added that the Supreme Court neither held any single factor to be dispositive, nor did it require all four factors to be met. *Scott v. Mississippi Dept. of Corrections*, 961 F.2d 77, 80 (5th Cir. 1992). The first factor has been held to be controlling in these cases, and the other factors merely provided help in determining whether the connection was logical. *Id.* at 81. More recently, the Fifth Circuit reaffirmed the basic idea that rationality is the controlling factor. *Mayfield*, 529 F.3d at 607.

Because Plaintiff has not shown a violation under RLUIPA, he likewise has not shown a violation of the Free Exercise Clause because RLUIPA imposes a more stringent standard than that of the First Amendment. *Patel v. U.S. Bureau of Prisons*, 515 F.3d

807, 813 (8th Cir. 2008). Indeed, in *Freeman*, the Fifth Circuit expressed surprise that the inmate plaintiff brought religious claims under the First Amendment instead of RLUIPA because RLUIPA provides far greater challenges to prison regulations. 369 F.3d at 857 n.1. The Fifth Circuit has considered free exercise claims similar to Plaintiff's claims and has rejected them. *See Freeman*, 369 F.3d at 862-63 (rejecting challenge to policy regarding volunteers); *Baranowski*, 486 F.3d at 121-22 (rejecting challenge to volunteer policy); *Thunderhorse, supra* (rejecting requests for items to practice NA faith, observance of holy days and pipe ceremony). As shown under the discussion of RLUIPA, there are valid rational connections between the challenged policies and practices and compelling governmental interests. The first factor in the *Turner* analysis is satisfied with respect to all of Plaintiffs' claims.  Thus, it is respectfully recommended that Plaintiff's First Amendment claims be dismissed with prejudice.

## VI.    Recommendation.

The summary judgment evidence establishes that the TDCJ policies challenged by Plaintiff, -- the Native American pipe policy, the frequency of services, the grooming policy, and the devotional items policy, -- all impose substantial burdens on Plaintiff Legate's religious exercise.  However, the TDCJ has established with an abundance of uncontested and unchallenged evidence that the policies are indeed the least restrictive means of furthering the TDCJ's compelling interests in maintaining security and monitoring costs.  Moreover, because the protections offered by the First Amendment are more limited than those extended under RLUIPA, Plaintiff's First Amendment claims fail as a matter of law.  Accordingly, it is respectfully recommended that Defendant's motion

for summary judgment (D.E. 23) be granted, and that Plaintiff's claims be dismissed with prejudice.

Respectfully submitted on this 6th day of June, 2014.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United* Servs. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).